LaMonte Rydell MARTIN,
petitioner, Appellant,

v.

STATE of Minnesota, Respondent.

No. A12–0089.

Supreme Court of Minnesota.

Jan. 30, 2013.

Zachary A. Longsdorf, Longsdorf Law Firm, PLC, Lake Elmo, MN, for appellant.

Lori Swanson, Attorney General, St. Paul, MN; and Michael O. Freeman, Hennepin County Attorney, Linda K. Jenny, Assistant County Attorney, Minneapolis, MN, for respondent.

Considered and decided by the court without oral argument.

## OPINION

DIETZEN, Justice.

Appellant LaMonte Rydell Martin was found guilty by a Hennepin County jury of aiding and abetting first-degree premeditated murder, Minn.Stat. § 609.185(a)(1) (2012), and committing a crime for the benefit of a gang, Minn.Stat. § 609.229, subd. 2 (2012), arising out of the shooting death of Christopher Lynch on May 3, 2006. The district court entered judgment of conviction on the first-degree premeditated murder charge and sentenced Martin to life in prison without the possibility of release. We affirmed Martin's conviction on direct appeal. *State v. Martin,* 773 N.W.2d 89 (Minn.2009). Martin filed a petition for postconviction relief on August 2, 2011, which the postconviction court summarily denied. Because we conclude that Martin was entitled to an evidentiary

hearing on his claim of witness recantation, but not on his remaining postconviction claims, we affirm in part, reverse in part, and remand.

*Pretrial Proceedings*

In May 2006 Martin was 17 years old. Pursuant to Minn.Stat. §§ 260B.007, subd. 6(b), 260B.101, subd. 2 (2012), the State automatically certified Martin as an adult by filing a two-count complaint alleging aiding and abetting first-degree premeditated murder, Minn.Stat. § 609.185(a)(1), and committing a crime for the benefit of a gang, Minn.Stat. § 609.229, subd. 2. Three weeks later, a grand jury indicted Martin on both charges alleged in the complaint. The grand jury also indicted Cornelius Jackson and Jonard McDaniel with aiding and abetting Martin in the murder of Lynch and with committing a crime for the benefit of a gang.

*Jury Trial and Sentencing*

The State presented the evidence[1] against Martin and Jackson in a combined jury trial.[2] The State's theory was that Lynch was an innocent victim and that his murder was "collateral damage" in an ongoing gang dispute. The identity of the shooters was a highly contested issue at trial. Only two of the State's eyewitnesses, Jermaine Mack–Lynch and his older brother Charles Pettis, were able to provide direct evidence that Martin and Jackson shot Lynch.

Mack–Lynch testified that on the evening of May 3, 2006, he was walking through a residential neighborhood in north Minneapolis with his cousin, Lynch, when they saw a white car occupied by three members of the One–Nines gang. Mack–Lynch, who was a member of the Tre Tre gang, recognized the driver as

Martin and the two passengers as Jackson and McDaniel. Because there was an ongoing dispute between the One–Nines gang and the Tre Tre gang, Mack–Lynch and Lynch fled down an alley. Martin and Jackson jumped out of the car holding pistols and chased them down the alley. While Lynch stopped to catch his breath in the back yard of 626 Thomas Avenue, Mack–Lynch ran ahead in an effort to lead Martin and Jackson away from Lynch. Eventually, Mack–Lynch reached the home of his older brother, Pettis. The Pettis home was located across the street from the house immediately north of 626 Thomas Avenue. Mack–Lynch asked Pettis and C.S., who was Pettis's then-girl-friend, if Lynch was there. When Pettis said that he had not seen Lynch, Mack–Lynch explained that the One–Nines were chasing Lynch. As they stood in the living room, Mack–Lynch, Pettis, and C.S. heard gunshots. In response to the gunshots, Mack–Lynch looked across the street and saw Martin and Jackson firing their guns toward the back yard of 626 Thomas Avenue. Mack–Lynch ran across the street and saw McDaniel drive the white car down the alley and Martin and Jackson jump into the car. As the three men drove away, Mack–Lynch found Lynch mortally wounded in the back yard of 626 Thomas Avenue.

Pettis also testified at trial. He told the jury that on the date of the shooting, Mack–Lynch rushed into his home in a frantic manner, saying that the One–Nines were chasing Lynch. After asking Mack–Lynch some clarifying questions, Pettis looked out the front door of his home and saw Martin and Jackson standing in the front yard of 626 Thomas Avenue. Martin

---

1. A more detailed description of the facts of this case can be found in this court's opinion on direct appeal. *Martin,* 773 N.W.2d 89.

2. McDaniel was tried in a separate proceeding. *State v. McDaniel,* 777 N.W.2d 739, 743 (Minn.2010).

and Jackson were holding handguns and looked like they were searching for Mack–Lynch. Martin and Jackson then ran into the back yard of 626 Thomas Avenue and Pettis heard gunshots. In response to the gunshots, Pettis ran across the street and saw Jackson and Martin get into a white car and drive away. Pettis and Mack–Lynch then found Lynch mortally wounded in the back yard of 626 Thomas Avenue.

Ten-year-old S.H. witnessed the shooting from his back porch. He could not see the two shooters' faces, but he did observe that the shooters were black men wearing hats. S.H. also testified that Lynch had his hands in the air when he was shot. When S.H.'s father heard the gunfire, he went out onto the porch and saw "two guys" jump into a white car; one of the men was wearing a red baseball cap and a red-and-white striped shirt.

Additionally, Paris Patton, a member of the One–Nines gang, and Kiron Williams, a member of the Vice Lords gang, testified that Martin, Jackson, and McDaniel made admissions to them regarding their involvement in Lynch's murder. Both Patton and Williams were in federal custody on narcotics charges. They agreed to testify in exchange for the possibility of a reduced sentence in federal court. About a month after the murder, Patton overheard Jackson say that Lynch was on his knees begging for his life when Jackson shot him. According to Williams, Martin bragged to him about chasing Mack–Lynch and then killing the person who was with him.

The jury found Martin guilty as charged. At the sentencing hearing, Martin presented Individual Education Plans (IEPs) from his high school that documented possible learning disabilities and a low IQ, and medical reports indicating Martin previously had been shot in the head. Martin argued that the imposition of life imprisonment without the possibility of release, mandated by Minn.Stat. §§ 609.106, subd. 2(1), 609.185(a)(1) (2012), constituted cruel and unusual punishment under U.S. Const. amend. VIII and Minn. Const. art. 1, § 5 because he was a juvenile at the time of the offense. The district court disagreed, explaining that Martin was less than two months away from his eighteenth birthday when he committed the offense, and therefore his "age of 17 is not a factor that renders the punishment of life in prison without parole unconstitutional under either the Eighth Amendment to the U.S. Constitution or under the Minnesota Constitution."[3] After convicting Martin of first-degree premeditated murder, the district court imposed a sentence of life imprisonment without the possibility of release.

*Direct Appeal*

On direct appeal, Martin challenged his conviction and sentence asserting nine claims, four of which are relevant here.[4] First, Martin claimed the State committed

---

3. Although Martin asserted an Eighth Amendment challenge to his sentence on direct appeal, his petition for postconviction relief does not contain such a challenge. Martin's case therefore does not squarely present the issue of whether the United States Supreme Court's decision in *Miller v. Alabama*, —— U.S. ——, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012) applies retroactively.

4. On direct appeal, Martin asserted five additional claims: (1) that the district court erred when it joined the cases for trial, *Martin*, 773 N.W.2d at 99; (2) erred when it sustained the prosecutor's peremptory challenge to a prospective juror, *id.* at 100; (3) erred when it refused to play audio and video evidence of the scene, *id.* at 109; (4) erred in allowing Pettis to testify after he heard the testimony of another witness, *id.* at 110; and that (5) the prosecutor committed reversible error during witness questioning and closing argument, *id.* at 104–05.

a discovery violation when it failed to timely disclose the notes of a police investigator. *Martin*, 773 N.W.2d at 109. He next claimed trial counsel was ineffective when she failed to investigate the State's "key" witnesses. *Id.* Martin also claimed the State failed to prove all of the elements of committing a crime for the benefit of a gang. *Id.* at 108. Finally, Martin claimed sentencing him to life imprisonment without the possibility of release was cruel and unusual punishment because he was a juvenile at the time of the crime. *Id.* at 97. We affirmed Martin's conviction and sentence. *Id.* at 110.

### Postconviction Proceedings

In August 2011, Martin filed a petition for postconviction relief pursuant to Minn. Stat. § 590.01, subd. 1 (2012). The petition alleged seven claims, including a claim that Martin is entitled to an evidentiary hearing and a new trial based on affidavits signed by Mack–Lynch and Pettis.[5] Also, the petition alleged ineffective assistance of appellate counsel. In support of that claim, Martin argued his appellate counsel was ineffective when she did not challenge the district court's failure to hold a mental competency hearing pursuant to Minn. R.Crim. P. 20.

Martin's remaining postconviction claims alleged ineffective assistance of trial counsel and four due process violations. According to Martin, the district court violated his right to due process by (1) automatically certifying him as an adult; (2) allowing the State to present the untimely-disclosed notes of the police investigator and by refusing to allow Martin to present videotape evidence of the crime scene; (3) convicting him of the offense of committing a crime for the benefit of a gang when the State failed to prove all of the elements of the offense; and (4) trying him in spite of questions about his mental competence.

The postconviction court summarily denied the petition, concluding that Martin was not entitled to an evidentiary hearing under Minn.Stat. § 590.04, subd. 1 (2012). Specifically, the court concluded that Martin failed to meet the requirements of the three-part test articulated in *Larrison v. United States*, 24 F.2d 82, 87–88 (7th Cir. 1928), regarding the Mack–Lynch and Pettis recantations, and therefore he was not entitled to an evidentiary hearing on his witness-recantation claim.[6] The court also rejected the claim of ineffective assistance of appellate counsel, explaining that Martin failed to prove that counsel's conduct fell below an objective standard of reasonableness or that the failure to raise the Rule 20 issue affected the outcome of the proceedings. The court summarily denied Martin's remaining postconviction claims, concluding that they were barred by *State v. Knaffla*, 309 Minn. 246, 252, 243 N.W.2d 737, 741 (1976).

On appeal, Martin raises three claims to support his argument that the postconvic-

---

5. In support of his claim of witness recantation, Martin also submitted the affidavits of fellow inmate Jesse Walker and defense investigator Michael Grostyan. Walker alleged in his affidavit that Mack–Lynch told him that he regrets testifying falsely at Martin's trial. Grostyan alleged in his affidavit that he spoke with Patton, who purportedly said he would testify at a postconviction evidentiary hearing that Williams "made everything up in terms of his testimony." Because we conclude that a postconviction evidentiary hearing is required based on the affidavits of Mack–Lynch and Pettis, there is no need for any further discussion of the affidavits of Walker and Grostyan.

6. Although *Larrison* has been overruled, *see United States v. Mitrione*, 357 F.3d 712, 718 (7th Cir.2004), Minnesota continues to apply the *Larrison* test to claims of witness recantation. *See Reed v. State*, 793 N.W.2d 725, 737 (Minn.2010).

tion court abused its discretion in summarily denying his petition without an evidentiary hearing.

## I.

First, Martin argues the postconviction court abused its discretion when it concluded he was not entitled to an evidentiary hearing on his witness recantation claim. We review a postconviction court's factual findings under a clearly erroneous standard and will not disturb those findings if there is sufficient evidentiary support. *Doppler v. State*, 771 N.W.2d 867, 875 (Minn.2009). But we review a postconviction court's legal conclusions de novo. *Ferguson v. State (Ferguson II)*, 779 N.W.2d 555, 559 (Minn.2010).

The postconviction court must consider different criteria to determine whether a defendant is entitled to an evidentiary hearing on a claim of witness recantation, and to determine whether a defendant is entitled to a new trial on such a claim.

The question of whether a defendant is entitled to an evidentiary hearing on a witness recantation claim is governed by Minn.Stat. § 590.04, and applicable case law. To determine whether petitioner is entitled to an evidentiary hearing, the postconviction court must determine whether the competent evidence presented by petitioner considered in the light most favorable to the petition, together with the arguments presented by the parties, conclusively show that the petitioner is not entitled to relief. *Id.* If so, the court may deny the request for an evidentiary hearing. *Riley v. State*, 819 N.W.2d 162, 167 (Minn.2012). If the court concludes that material facts are in dispute and that the allegations in the petition, if true, would entitle the petitioner to relief, then the court must schedule an evidentiary hearing. *Id.* at 167–68. Any doubts as to whether to conduct an evidentiary hearing

should be resolved in favor of the petitioner. *Bobo v. State*, 820 N.W.2d 511, 516 (Minn.2012).

In contrast, the *Larrison* test sets forth the criteria to determine whether a defendant is entitled to a new trial on a claim of witness recantation. *Larrison*, 24 F.2d at 87–88. Specifically, the criteria are that: (1) the court is reasonably well-satisfied that the testimony given by a material witness was false; (2) that without the testimony, the jury might have reached a different conclusion; and (3) the petitioner was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after trial. *State v. Turnage (Turnage II)*, 729 N.W.2d 593, 597 (Minn.2007). The first two prongs are compulsory. *Opsahl v. State (Opsahl II)*, 710 N.W.2d 776, 782 (Minn.2006). The third prong is relevant, but not an "absolute condition precedent" to a new trial. *Ferguson II*, 779 N.W.2d at 559 (internal quotation marks omitted).

The first prong of *Larrison* is met when the court is " 'reasonably certain that the recantation is genuine.' " *Ferguson II*, 779 N.W.2d at 559–60 (quoting *State v. Walker*, 358 N.W.2d 660, 661 (Minn.1984)). We have observed that an evidentiary hearing is often necessary to resolve credibility determinations regarding a recanting witness's conflicting statements. *Id.* at 560; *Wilson v. State*, 726 N.W.2d 103, 107 (Minn.2007); *Opsahl v. State (Opsahl I)*, 677 N.W.2d 414, 423–24 (Minn.2004). Although an evidentiary hearing is often necessary, the recantation must still contain sufficient "indicia of trustworthiness" to warrant a hearing. *State v. Ferguson (Ferguson I)*, 742 N.W.2d 651, 660 (Minn.2007); *Vance v. State (Vance II)*, 752 N.W.2d 509, 514 (Minn.2008). Put another way, a court

cannot be reasonably certain the recantation is genuine unless it contains "sufficient indicia of trustworthiness." *Ferguson II*, 779 N.W.2d at 560.

Previously, we held that a postconviction court misapplied Minn.Stat. § 590.04 when it concluded that "the recantations were unreliable without first evaluating the credibility of witnesses at an evidentiary hearing." *Opsahl I*, 677 N.W.2d at 423–24. In *Opsahl I*, the defendant was charged with first-degree murder arising out of the shooting death of the victim. *Id.* at 417–18. The State's case relied on statements made by the defendant to several acquaintances that implicated him in the murder. *Id.* at 418. After we affirmed the defendant's conviction on direct appeal, several witnesses recanted their trial testimony in affidavits, including L.R. and M.A. *Id.* at 419–20. L.R. stated she fabricated her testimony based on a letter she received that described the murder, and M.A. allegedly fabricated her testimony "out of anger at Opsahl, who had been an abusive boyfriend." *Id.* We concluded that the affidavits submitted in support of Opsahl's witness-recantation claim met "the minimal standard for an evidentiary hearing," and therefore the postconviction court abused its discretion in denying Opsahl's petition without an evidentiary hearing. *Id.* at 423–24.

On the other hand, when the affidavits submitted in support of a witness-recantation claim fail to meet the minimal standard for an evidentiary hearing, we have affirmed the postconviction court's summary denial of a postconviction petition. *Vance II*, 752 N.W.2d at 514–15. In *Vance*, the defendant was charged with first-degree murder arising out of the shooting death of a South Saint Paul convenience store clerk. *State v. Vance* (*Vance I* ), 714 N.W.2d 428, 432–33 (Minn. 2006). Eyewitnesses testified that the shooters fled the scene in a four-door, dark-colored car. *Id.* at 433. After we affirmed the defendant's conviction on direct appeal, two witnesses filed affidavits recanting their trial testimony. *Vance II*, 752 N.W.2d at 514–15. We concluded that one affidavit lacked "sufficient indicia of trustworthiness" because it came several years after the murder and trial testimony, the trial testimony was supported by a corroborating witness, and the affidavit gave no explanation for why the witness's memory was more reliable now than at trial. *Id.* at 514. We concluded that the other affidavit also lacked sufficient indicia of trustworthiness because it was objectively not true. *Id.* at 515. Specifically, the affidavit stated that the witness fabricated Vance's confession based on trial transcripts he found in the jail library. But the transcripts in question were not available at the time of trial and therefore he could not have based his testimony on them. *Id.* As discussed in more detail below, we conclude that Martin's case is more akin to *Opsahl* than to *Vance*.

■ Here, Pettis testified at trial that he saw both Martin and Jackson at the crime scene with handguns, witnessed both men run toward the back of the house where Lynch was found dead, and heard gunshots. Pettis stated that Martin and Jackson then hopped into a white car and fled the scene. At the police station hours after the murder, Pettis stated he saw two men flee the scene but did not pick Martin and Jackson out of the photographic lineups. He admitted that he did not tell police everything because he wanted to "deal with it [his] way." Also, he admitted that at the police station he made a telephone call outside the presence of the police in which he told a friend that he knew who killed Lynch, but he was not going to "tell these motherf*****s who shot [his] cousin." Pettis also testified that he knew

Martin and Jackson were members of the One–Nines gang, and that he had previously played basketball with both of them.

In his affidavit, Pettis stated that "after serving a great amount of time in prison," he wished to "make a wrong right." He claims that the first time he ever saw Martin and Jackson was in a holding cell at the Hennepin County jail the day before the trial, and that the prosecutor pressured him into testifying that Martin and Jackson killed Lynch so that his family could have closure. He stated, "I truely [sic] don't know who murdered my cousin like I stated at trial."

At trial, Mack–Lynch identified Martin as a member of the One–Nines gang and admitted he knew Martin because he played football with Martin's older brothers. Mack–Lynch also testified that he was a member of the Tre Tre gang, which was a rival of the One–Nines. Mack–Lynch testified that he was with Lynch on the day of the murder, and the two were walking southbound along Thomas Avenue toward Pettis's home at 701 Thomas Avenue when the incident occurred. In his affidavit, Mack–Lynch states that on the day of the murder he "never witnessed Mr. Jackson or Mr. Martin with a weapon nor at the scene, at the time of the incident the gangs we belong to were at odds, so I told my brother to say Jackson and Martin did it along with me." He further stated: "I had a rep to keep so I did not want people to know I was scared and I didn't see my attackers, so I mentioned names that people already knew of."

The postconviction court concluded that Martin failed to satisfy the first prong of the *Larrison* test because it was not reasonably satisfied that Mack–Lynch's and Pettis's trial testimony was false. Moreover, Martin failed to establish that without the false testimony the jury might have reached a different conclusion. The court emphasized that defense counsel vigorously impeached Mack–Lynch's and Pettis's testimony using felony convictions, prior omissions, and inconsistent statements.[7] Based on that impeachment, the postconviction court stated that the jury could have reasonably concluded that Mack–Lynch's and Pettis's testimony was false, but found Martin guilty based on the shooter descriptions provided by S.H. and his father, which matched the descriptions of Martin and Jackson. The court therefore concluded that Martin was not enti-

---

7. Mack–Lynch admitted on cross-examination that he had a 2005 conviction for unlawful firearm possession, and that he was under indictment for a 2006 homicide. He also admitted that in describing the chase to Pettis and C.S., he never mentioned Martin or Jackson. Mack–Lynch further admitted that during his grand jury testimony, he testified that he could not identify the driver who picked up the shooters. The defense also elicited testimony from C.S. and Officer Christopher Tucker that contradicted Mack–Lynch's testimony. C.S. testified that after they heard the gunshots, she and Mack–Lynch stayed on the front steps of the Pettis home while Pettis ran across the street. Officer Tucker testified that at the scene of the shooting Mack–Lynch told him that the shooters were Martin and McDaniel. Similarly, Pettis admitted on cross-examination that he had a 2003 conviction for simple robbery, a 2001 conviction for theft a motor vehicle, and he currently had a pending charge for aggravated robbery. Pettis also conceded that during his May 3, 2006, interview with the police, he denied knowing the identity of the shooters. As noted, Pettis stated that he lied to the police because he "wanted to deal with it my way" by "get[ting] revenge ... on the street." Pettis's explanation was corroborated by an interview-room recording that captured Pettis telling someone on his phone: "I know who did it" but "like I'd really tell these motherf*****s [police] who shot my cousin." In response to defense counsel's questioning, Pettis admitted that he never mentioned Martin's name during the recorded interview-room phone call.

tled to relief, and a hearing was not required.

We conclude that the postconviction court abused its discretion when it denied Martin's request for an evidentiary hearing on the claim of witness recantation. More specifically, the postconviction court conflated the requirements for a *postconviction evidentiary hearing* with the requirements for a *new trial*. To obtain a postconviction evidentiary hearing, Martin was not required to satisfy the *Larrison* test. Instead, he was simply required to present competent material evidence that, if found to be true following an evidentiary hearing, could satisfy the *Larrison* test. The affidavits of Mack–Lynch and Pettis formally recant their sworn testimony that Martin was one of the individuals who shot Lynch. Unlike the affidavits in *Vance*, which offered either no explanation or an objectively impossible explanation, the Mack–Lynch and Pettis affidavits offer explanations for the recantations. Mack–Lynch explained that he falsely identified Martin and Jackson as the shooters because "[he] had a rep to keep so [he] did not want people to know [he] was scared and [he] didn't see [his] attackers, so [he] mentioned names that people already knew of." Pettis explained that he falsely identified Martin and Jackson as the shooters to give his family closure, and that after reviewing Mack–Lynch's recorded statement to police, he simply agreed to what Mack–Lynch had told the police. Thus, when viewed in a light most favorable to the petition, the Mack–Lynch and Pettis affidavits present prima facie evidence of the first prong of the *Larrison* test. An evidentiary hearing was, therefore, required to assess the credibility of Mack–Lynch's and Pettis's postconviction testimony before the court could determine that it was, or was not, well-satisfied that their recantations were genuine.

■ We next examine the second prong of the *Larrison* test, which requires that petitioner prove that the jury "might have found [him] not guilty if [the witness] had not testified." *Turnage II*, 729 N.W.2d at 599. Originally, this prong was applied as a sufficiency of the evidence inquiry. *Larrison*, 24 F.2d at 88 (concluding that the witness's testimony was cumulative and there was evidence sufficient to convict all of the defendants without his testimony). We have concluded, however, that "might" is "something more than an outside chance although much less than . . . 'would probably.'" *State v. Caldwell*, 322 N.W.2d 574, 585 n. 8 (Minn.1982) (quoting *Kyle v. United States*, 297 F.2d 507, 512 (2d Cir.1961)). We examine whether the jury "would not likely" have found the defendant guilty and consider whether the "other evidence against the defendant was overwhelming." *Hooper v. State*, 680 N.W.2d 89, 95 (Minn. 2004); *State v. Flint*, 324 N.W.2d 359, 360 (Minn.1982); *see also Williams v. State*, 692 N.W.2d 893, 897 (Minn.2005) (concluding there was compelling evidence outside the witness's testimony to support the finding of guilt); *State v. Bowles*, 530 N.W.2d 521, 534 (Minn.1995) (concluding recantation was "not likely to produce either an acquittal or a more favorable result").

Previously, we have concluded that the postconviction court should examine what testimony was recanted, and then determine whether it *might* have made a difference if that testimony had not been presented at trial.[8] *Turnage II*, 729 N.W.2d

---

**8.** In analyzing the second prong of the *Larrison* test, the postconviction court failed to apply the "jury might have found the defendant not guilty" standard. Instead, the post-conviction court considered whether "[t]he jury could reasonably have concluded that [the testimony in question] was false, but nevertheless found Martin guilty."

at 600. In *Turnage II*, the State charged the defendant with first-degree murder arising out of the stabbing death of Wa Vang. *Id.* at 595. Two witnesses, D.R. and the defendant's brother, Q.T., both positively identified the defendant as the person who stabbed Vang. *Id.* at 595. On direct appeal, we affirmed the defendant's conviction and sentence. *State v. Turnage (Turnage I )*, 708 N.W.2d 535, 537 (Minn. 2006). When Q.T. recanted his trial testimony claiming that he had lied at trial based on a promise of leniency for his involvement in Vang's murder, the defendant filed a petition for postconviction relief seeking a new trial. *Turnage II*, 729 N.W.2d at 597. The postconviction court denied the petition without holding an evidentiary hearing. *Id.* Without deciding whether Q.T.'s affidavit satisfied the minimal showing required for an evidentiary hearing, we affirmed the postconviction court's denial of an evidentiary hearing explaining that we could not say that the jury might have found the defendant not guilty in the absence of Q.T.'s allegedly false trial testimony. *Id.* at 600. We emphasized that D.R. had positively identified the defendant as the person who stabbed Vang and that "the state's case against [the defendant] would have been even stronger without [Q.T.'s] testimony, because the inconsistency between [Q.T.] and [D.R.'s] version of events would have been removed from the case." *Id.*

Unlike *Turnage*, this case involves allegedly false trial testimony by Mack–Lynch and Pettis that constitutes the only direct evidence identifying Martin as one of the shooters. If we assume the facts alleged in the Mack–Lynch and Pettis affidavits are true, as we must when deciding whether a defendant is entitled to an evidentiary hearing, the testimony of S.H. and his father that the shooters were black males who were wearing hats and fled the scene in a white car does not preclude us from

saying that the jury "might" have found Martin not guilty had the jury not heard the allegedly false testimony. Thus, when viewed in a light most favorable to the petition, the Mack–Lynch and Pettis affidavits present sufficient evidence that, if believed by the postconviction court, could satisfy of the second prong of the *Larrison* test. We therefore conclude that the postconviction court abused its discretion when it denied Martin's request for an evidentiary hearing on the claim of witness recantation. Based on that conclusion, we remand Martin's claim of witness recantation to the postconviction court for an evidentiary hearing to assess the credibility of the recanting witnesses, and to determine whether Martin satisfies the *Larrison* factors, and therefore is entitled to a new trial.

## II.

Martin next argues that the postconviction court abused its discretion when it summarily denied his ineffective-assistance-of-appellate-counsel claim. To obtain a new trial for ineffective assistance of counsel, a defendant must satisfy the two-pronged test of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under the *Strickland* test, a defendant must show that (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Reed v. State*, 793 N.W.2d 725, 733 (Minn.2010) (citations omitted) (internal quotation marks omitted). We may address the *Strickland* prongs in either order and may dispose of a claim on one without analyzing the other. *Jackson v. State*, 817 N.W.2d 717, 722 (Minn.2012). Under the first prong of the *Strickland* test, counsel's performance is objectively

reasonable if he or she exercises " 'the customary skills and diligence that a reasonably competent attorney would perform under similar circumstances.' " *Reed,* 793 N.W.2d at 733 (quoting *State v. Gassler,* 505 N.W.2d 62, 70 (Minn.1993)). Counsel's performance is presumed to be reasonable. *Id.* "[A]ppellate counsel is not required to raise claims on direct appeal that counsel could have legitimately concluded would not prevail." *Williams v. State,* 764 N.W.2d 21, 31 (Minn.2009).

 Martin claims his appellate counsel was ineffective because she did not challenge the district court's failure to hold a mental competency hearing pursuant to Minn. R.Crim. P. 20. But, as discussed below, Martin's Rule 20 claim was relatively weak when compared to the other claims that appellate counsel raised on direct appeal.

Under Rule 20, a defendant is incompetent and must not be tried or sentenced if the defendant lacks the ability to: (1) "rationally consult with counsel," or (2) "understand the proceedings or participate in the defense due to mental illness or deficiency." Minn. R.Crim. P. 20.01, subd. 2. If the court finds there is reason to doubt a defendant's competency, it must suspend the criminal proceedings. Minn. R.Crim. P. 20.01, subd. 3. In considering whether there is reason to doubt a defendant's competency, the court should consider factors such as "[e]vidence of the defendant's irrational behavior, demeanor at trial, and any prior medical opinion on competence to stand trial." *State v. Camacho,* 561 N.W.2d 160, 172 (Minn.1997).

At the sentencing hearing, Martin presented records from his high school that documented possible learning disabilities and a low IQ, and medical reports indicating Martin previously had been shot in the head. Martin, however, does not explain, nor are we able to discern, how the records submitted at the sentencing hearing provided the district court a reason to doubt Martin's mental competence to stand trial. More importantly, Martin does not contest the postconviction court's finding that he fully participated in his trial: Martin passed notes with his co-defendant, conversed with counsel, and engaged in a discussion of a plea bargain with counsel.

In sum, the record in Martin's case does not support a conclusion that appellate counsel acted in an objectively unreasonable manner when she chose not to pursue the weak Rule 20 claim on direct appeal. Because the petition, files, and records of the proceeding conclusively showed that Martin was entitled to no relief on his claim of ineffective-assistance-of-appellate-counsel, the postconviction court did not abuse its discretion when it denied the claim without an evidentiary hearing.

### III.

Finally, Martin argues that the postconviction court abused its discretion when it concluded that his remaining postconviction claims were barred by *State v. Knaffla,* 309 Minn. 246, 243 N.W.2d 737 (1976). We disagree.

 In *Knaffla,* we explained that when a direct appeal has been taken, all matters raised therein, and all claims known or that should have been known, will not be considered in a subsequent petition for postconviction relief. 309 Minn. at 252, 243 N.W.2d at 741. A defendant cannot recharacterize a claim previously litigated to avoid the *Knaffla* procedural bar. *See Black v. State,* 560 N.W.2d 83, 86 (Minn.1997) ("We will not allow [the petitioner] to avoid the *Knaffla* limitation simply by restating an evidentiary issue in terms of ineffective assistance of trial counsel."); *White v. State,* 711 N.W.2d 106,

110 (Minn.2006). The *Knaffla* procedural bar is subject to two exceptions: (1) the claim is so novel that its legal basis was not reasonably available to counsel when the direct appeal was taken and decided; and (2) even if the claim's legal basis was sufficiently available, substantive review may be allowed when fairness so requires and when the petitioner did not deliberately and inexcusably fail to raise the issue on direct appeal. *Leake v. State*, 737 N.W.2d 531, 535 (Minn.2007).

The postconviction court concluded that *Knaffla* barred Martin's claim of ineffective assistance of trial counsel and his claims that the district court violated his right to due process by (1) automatically certifying him as an adult; (2) allowing the State to present the untimely-disclosed notes of the police investigator and by refusing to allow Martin to present videotape evidence of the crime scene; (3) convicting him of the offense of committing a crime for the benefit of a gang when the State failed to prove all of the elements of the offense; and (4) trying him in spite of questions about his mental competence. The postconviction court explained that all of these claims were either "fully and fairly addressed on direct appeal," or could have been raised on direct appeal.

Martin asserts three arguments in support of his contention that the postconviction court abused its discretion when it concluded that his ineffective-assistance-of-trial-counsel and due process claims were *Knaffla*-barred. First, he argues that the issues raised in the postconviction petition "are not the same as those raised on direct appeal." Second, he could not raise the mental competency issue in his direct appeal because he "had no idea that he even had the right to be tried only while competent until much later, when he discovered that right through his own research." Third, his claims fall within the interests of justice exception to the *Knaffla*-bar.

 Based upon our review of the record, we conclude that the petition, files, and records of the proceeding conclusively show that Martin's ineffective-assistance-of-trial-counsel and due process claims were fully and fairly addressed on direct appeal, could have been raised on direct appeal, and/or do not satisfy the interests of justice exception to the *Knaffla*-bar.[9] Consequently, the postconviction court did not abuse its discretion when it summarily denied those claims.

The postconviction court erred in denying Martin's request for an evidentiary hearing on his claim of witness recantation, but the postconviction court did not err in finding Martin's ineffective-assistance-of-appellate-counsel claim to be without merit and in concluding that Martin's remaining claims were *Knaffla*-barred.

Affirmed in part, reversed in part, and remanded.

WRIGHT, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.

---

9. Because we conclude that Martin's claims do not satisfy the interests of justice exception to the *Knaffla* procedural bar, we need not, and do not, decide whether the Legislature intended to incorporate an interest of justice exception into the procedural bar set forth in Minn.Stat. § 590.01, subd. 1 (2012), which simply provides that "[a] petition for postconviction relief after a direct appeal has been completed may not be based on grounds that could have been raised on direct appeal of the conviction or sentence."