STATE OF MINNESOTA

IN SUPREME COURT

A14-0171

Dodge County                                                                                                   Gildea, C.J.

Danny Ortega, Jr., petitioner,

                    Appellant,

vs.                                                                                        Filed:  November 19, 2014
                                                                                               Office of Appellate Courts
State of Minnesota,

                    Respondent.

_____

Jennifer Congdon, Jennifer Congdon Law, Saint Paul, Minnesota, for appellant.

Lori Swanson, Attorney General, Matthew Frank, Assistant Attorney General, Saint Paul, Minnesota; and

Paul Kiltinen, Dodge County Attorney, Mantorville, Minnesota, for respondent.

_____

S Y L L A B U S

Because the record establishes that even without the recanted testimony, the jury would not have reached a different result at trial, the postconviction court did not abuse its discretion when it denied appellant's request for a new trial without holding an evidentiary hearing on his witness-recantation claim.

Affirmed.

Considered and decided by the court without oral argument.

1

O P I N I O N

GILDEA, Chief Justice.

Following a jury trial, the district court convicted Danny Ortega, Jr. of aiding and abetting first-degree premeditated murder and sentenced him to life in prison without the possibility of release. We affirmed Ortega's conviction on direct appeal. *State v. Ortega* (*Ortega I*), 798 N.W.2d 59 (Minn. 2011). Ortega subsequently filed a petition for postconviction relief, alleging that Eric Bermea, who testified as an eyewitness at the trial, provided false testimony and had recanted that testimony. The postconviction court summarily denied the petition. Because the allegedly false testimony was cumulative to other compelling evidence and the outcome of the proceedings would not have been different had the testimony not been admitted at trial, we affirm.

On February 16, 2008, Troy Ulrich was stabbed to death in a garage at his apartment building in Claremont, Minnesota.[1] The State charged Ortega with aiding and abetting first-degree premeditated murder, Minn. Stat. §§ 609.185(a)(1), 609.05, subd. 1 (2012). Ortega pleaded not guilty and demanded a jury trial.

At trial, the State presented the following evidence. Ortega lived with his grandfather, Severo Ortega ("Severo"), across the hall from Ulrich. On the afternoon of February 15, 2008, a group gathered in Ortega's apartment to play cards and drink

---

[1] Our opinion in *Ortega I*, 798 N.W.2d 59, contains a detailed factual description of the murder and the evidence presented at trial. We limit our discussion in this opinion to facts directly relevant to this petition.

alcohol, including Ortega, his girlfriend, and his cousins, Anthony and Eric Bermea ("Anthony" and "Eric"). Later, Ulrich joined the group and brought beer that he shared.

Shortly after Ulrich arrived, an argument developed between Ulrich and Ortega. Ulrich, Eric, and Anthony then left the apartment and moved to a garage rented by the Bermeas' father. Eric testified that on his way out, he heard Ortega call Ortega's father, Danny Ortega, Sr. ("Senior"), and complain, "somebody was fucken [sic] with him." After that call, Senior came to Ortega's apartment, and at trial, Ortega's girlfriend testified that Senior was drunk and "ranting and raving" when he got to the apartment.

Ortega and Senior went to the garage where Ulrich, Eric, and Anthony had gone and entered without knocking. A fight then broke out. Eric and Anthony each testified that Senior was the initial aggressor, shoving Ulrich and asking, "What the fuck do you have with my son?" Eric and Anthony testified that Ulrich pushed back and said that he did not have a problem with Ortega. Eric claimed that Senior then started punching Ulrich. Both Eric and Anthony saw Ulrich pick up a metal light stand and hit Senior with it, causing Senior to fall down. Eric and Anthony both testified that Ortega then began striking Ulrich with a pair of bolt cutters.

According to Eric, Senior stood up and Senior and Ortega continued hitting Ulrich. Eric and Anthony heard Ulrich yell "He's got a knife," and they saw Ulrich fall to the ground. Neither Eric nor Anthony saw a knife in the hands of Ortega or Senior, but Eric saw Senior reach for his pocket, and they both saw Senior make swinging motions. Anthony claimed to see Ortega kicking Ulrich, who was on the ground, during this time. Eric then saw that Ulrich was bleeding, and Eric and Anthony left the garage. The doctor

performing Ulrich's autopsy concluded that Ulrich bled to death as a result of eight stab wounds and one puncture wound.

The State also offered physical evidence connecting Ortega to the murder and evidence of incriminating statements that Ortega made. In an interview with Agents Michael Wold and Scott Mueller the day after the incident, Ortega confessed that he stabbed Ulrich. He described the feeling as "like butter" and said that Ulrich kept saying "stop stabbing me." In a second interview two days later with Investigator Jeremy Gunderson, Ortega admitted that he kicked Ulrich in the face and stabbed him at least twice in his side. He described his thought process, saying, "I looked down before I started kickin' him and I was like, should I or should I not. And I was like fuck it so I kicked him in the face and then before I ran out I (Makes noise) pop pop and then I was gone."

Several witnesses recounted other inculpatory statements that Ortega made prior to his arrest. Ortega's girlfriend testified that Ortega called his mother and "told her that he had stabbed somebody, and he needed a place to go." A friend of Ortega's testified that Ortega said that he "did something dumb the night before" and that "there was a fight, some people got hurt." Another friend testified that Ortega told her "that he had killed somebody last night," and that Ortega laughed as he told her that he stabbed a person who had only one arm.[2] Another friend testified that Ortega said something to the effect of, "I did something really bad and I'm going to go down."

---

[2]    Ulrich had only one arm following an amputation.

Other witnesses testified about inculpatory statements Ortega continued to make after his arrest. During his booking, Ortega said to an officer, "I always told myself if I was going to come back to jail, it would be for killing someone, and it actually happened." When a correctional deputy was explaining the operational procedures at the jail, Ortega spontaneously said, "I murdered somebody." He added, "I stuck him four times and my dad three times, and I left his ass on the floor. I mean he was dead."

The jury found Ortega guilty as charged and the district court convicted Ortega of aiding and abetting first-degree premeditated murder.[3] We affirmed. *Ortega I*, 798 N.W.2d at 62. Ortega subsequently filed a petition for postconviction relief, claiming that "information has surfaced showing that a critical witness (Eric Bermea) has recanted testimony regarding [Ortega]'s involvement in the crime." Ortega asserted that he is entitled to a new trial because "his conviction was based upon witness testimony that was false."[4]

---

[3] Senior also had a jury trial and was convicted of the same offense. We affirmed his conviction. *State v. Ortega*, 813 N.W.2d 86 (Minn. 2012).

[4] Ortega's petition also claimed that he is entitled to a new trial because "there is newly discovered evidence undermining the validity of his conviction" and because he "received ineffective assistance of trial counsel." Other than these statements in his petition, Ortega did not make any arguments to the postconviction court or in his brief to this court to support a claim of newly discovered evidence or ineffective assistance of counsel. We have held that issues not raised on appeal are waived. *Jackson v. State*, 817 N.W.2d 717, 721 n.3 (Minn. 2012); *see also State v. Powers*, 654 N.W.2d 667, 676 (Minn. 2003) ("Issues not addressed by a party's brief are considered waived, and we will not address those . . . motions here."). Because Ortega did not raise an issue of newly discovered evidence or ineffective assistance of counsel on appeal, those issues are not before us and we do not address them further.

In support of his petition, Ortega filed an affidavit from Severo, his grandfather. Severo is also Eric Bermea's uncle. In the affidavit, Severo claims that Eric told him on several occasions since the trial that Eric "regrets the way he testified, and that [Eric] felt pressure to put more blame on Danny Ortega Jr. than really happened." Specifically, Severo claims that Eric said that "Danny Ortega Jr. and Danny Ortega Sr. did not [start] the fight with Troy Ulrich, and that they were acting in self-defense." Further, Severo claims that Eric "has also said that he felt pressured to testify that Danny Ortega Jr. was hitting Troy Ulrich when he did not see most of the fight."[5]

The postconviction court denied the petition without an evidentiary hearing. The court held that Ortega was "not entitled to an evidentiary hearing because he has failed to present competent material evidence that, if found to be true following an evidentiary hearing, could satisfy the test set forth in *Larrison v. United States.*" This appeal followed.

We review the denial of a petition for postconviction relief for an abuse of discretion. *Riley v. State*, 819 N.W.2d 162, 167 (Minn. 2012). We review legal issues de

---

[5] Ortega also submitted an affidavit from Senior. In that affidavit, Senior claims that he was ready and willing to testify on Ortega's behalf at his trial, but was "prevented from testifying by [his] lawyers and Danny Ortega Jr.'s lawyers." Senior claims that he would have testified that "Danny Ortega Jr. did not stab Troy Ulrich or contribute to his death in any way." Senior says that "[w]hen I realized Troy Ulrich was not going to stop fighting, I took out my pocketknife and stabbed him multiple times in self-defense." Ortega did not raise an argument that this affidavit represents newly discovered evidence or evidence of ineffective assistance of counsel. Ortega references Senior's affidavit in his brief to our court merely as evidence that corroborates Eric's recantation of his trial testimony. We therefore consider Senior's affidavit only to the extent that it corroborates Eric's recantation.

6

novo, but review of factual matters is limited to determining whether there is sufficient evidence in the record to sustain the postconviction court's findings. *Vance v. State*, 752 N.W.2d 509, 512 (Minn. 2008). We have said that "a matter will not be reversed unless the postconviction court exercised its discretion in an arbitrary or capricious manner, based its ruling on an erroneous view of the law, or made clearly erroneous factual findings." *Reed v. State*, 793 N.W.2d 725, 729 (Minn. 2010).

Minnesota Statutes ch. 590 (2012) governs petitions for postconviction relief. The petitioner has the burden of proof to show that he is entitled to relief. *See* Minn. Stat. § 590.04, subd. 3. But the showing required for an evidentiary hearing is lower than that required for a new trial. *Bobo v. State*, 820 N.W.2d 511, 516 (Minn. 2012). The statute provides that a postconviction court shall hold an evidentiary hearing "[u]nless the petition and the files and records of the proceeding conclusively show that the petitioner is entitled to no relief." Minn. Stat. § 590.04, subd. 1. If "the competent evidence presented by petitioner considered in the light most favorable to the petition, together with the arguments presented by the parties, conclusively show[s] that the petitioner is not entitled to relief," the postconviction court may deny the petition without holding an evidentiary hearing. *Martin v. State*, 825 N.W.2d 734, 740 (Minn. 2013). Any doubts about whether to conduct a hearing should be resolved in favor of the defendant. *Bobo*, 820 N.W.2d at 516.

## I.

Ortega argues in his petition that he is entitled to a new trial because Eric provided false testimony at the trial. In determining whether a petitioner is entitled to a new trial

based on a witness recantation, we follow the three-prong test set forth in *Larrison v. United States*, 24 F.2d 82, 87-88 (7th Cir. 1928).[6] *Opsahl v. State*, 677 N.W.2d 414, 422 (Minn. 2004). Under the *Larrison* test, a postconviction court should grant a request for a new trial based on recanted testimony when: (1) the court is reasonably well-satisfied that the testimony given by a material witness is false; (2) without it the jury might have reached a different conclusion; and (3) the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial. *Larrison*, 24 F.2d at 87-88. The first two factors must be satisfied for a new trial to be granted, but the third factor, while relevant, is not an absolute condition precedent to relief. *Ferguson v. State*, 645 N.W.2d 437, 445 (Minn. 2002). When applying the *Larrison* factors to determine whether to grant an evidentiary hearing, the postconviction court must assume the truth of the allegations in the petition. *Caldwell v. State*, 853 N.W.2d 766, 772 (Minn. 2014).

The postconviction court denied Ortega's petition, concluding that the first prong of the *Larrison* test was not met. The court concluded that the affidavit "completely fail[s] to meet the minimal standard for an evidentiary hearing" and that the court was "not well-satisfied that the trial testimony of Eric Bermea was false." The court emphasized the hearsay nature of Severo's affidavit, noting that "[t]here is no admissible

---

[6] *Larrison* has been overruled, *see United States v. Mitrione*, 357 F.3d 712, 718 (7th Cir. 2004), but we continue to apply its test in cases involving witness recantation and false testimony. *Martin*, 825 N.W.2d at 739 n.6. *See State v. Caldwell*, 322 N.W.2d 574, 584-87 (Minn. 1982) (adopting the test set forth in *Larrison*).

evidence in the current record from Eric Bermea indicating that he is recanting his trial testimony or the details of the recantation." The court also concluded that Eric's recantation was insufficient under the second *Larrison* prong, stating that the court was "hard pressed to know what Eric Bermea could now say that would allow a jury to reach a different conclusion given the compelling evidence in the trial record of Defendant's guilt."

Ortega challenges the postconviction court's conclusions, contending that the court applied an incorrect legal standard and inappropriately made credibility determinations without first conducting an evidentiary hearing. We do not need to determine whether the postconviction court erred in its analysis of the first prong of the *Larrison* test because our analysis under the second prong of *Larrison* is dispositive of this appeal. When the second prong is dispositive, we need not consider the first or third prong. *Evans v. State*, 788 N.W.2d 38, 48 (Minn. 2010).

The second *Larrison* prong does not ask whether the evidence is *sufficient* to convict the defendant in the absence of the recanted testimony. *State v. Turnage*, 729 N.W.2d 593, 599 (Minn. 2007). Instead, for an evidentiary hearing to be required, Ortega need only show that it *might* have made a difference to the jury's verdict if the recanted testimony had not been presented at trial. *Martin,* 825 N.W.2d at 744. We have held that "might" means "something more than an outside chance although much less than . . . 'would probably.' " *State v. Caldwell*, 322 N.W.2d 574, 585 n.8 (Minn. 1982) (citation omitted) (internal quotation marks omitted). If the second prong is not satisfied, the postconviction court did not err in denying Ortega's petition without an evidentiary

hearing. *See Turnage*, 729 N.W.2d at 600 (affirming the denial of a postconviction petition because the second *Larrison* prong was not satisfied).

In cases in which recanted testimony comprises the only evidence of guilt, or is a substantially important part of the testimony as to the defendant's guilt, we have held that the second *Larrison* prong is satisfied and an evidentiary hearing should be granted. *See Martin*, 825 N.W.2d at 744 (holding that the second prong was satisfied when the allegedly false testimony constituted the "only direct evidence" identifying the defendant as one of the shooters); *Dobbins v. State*, 788 N.W.2d 719, 735 (Minn. 2010) (noting that the State had "little other direct evidence"); *Ferguson v. State*, 779 N.W.2d 555, 561 (Minn. 2010) (noting that the recanting witness was the only eyewitness to the shooting who testified); *Opsahl*, 677 N.W.2d at 424 (concluding the second *Larrison* prong was met when the recanted testimony challenged the truth of five out of seven witnesses who testified to hearing incriminating statements); *Ferguson v. State*, 645 N.W.2d at 444 (holding that it was "quite possible, maybe even probable, that the jury might have reached a different verdict" when there was very little evidence tying the defendant to the crime outside of the recanted testimony).

But when significant additional evidence of a defendant's guilt was presented at trial, besides the recanted testimony, we have concluded that the second *Larrison* prong is not satisfied. For example, in *Turnage*, two witnesses positively identified the defendant as the murderer. 729 N.W.2d at 595. One witness recanted his testimony. *Id.* at 597. We affirmed the denial of the petition without an evidentiary hearing, noting that the jury would still have heard the other witness's testimony, as well as testimony about

inculpatory statements Turnage made. *Id.* at 600. Similarly, in *Vance*, despite recanting affidavits from two witnesses, we held that there was no showing that the jury might have reached a different result when there was additional testimony from other witnesses placing Vance at the scene of the crime. 752 N.W.2d at 515-16. And in *Evans*, we acknowledged that the recanting witness "was an important witness for the State," but held that in light of other corroborating witnesses and physical evidence, the petitioner had not demonstrated that the jury might have acquitted him absent the false testimony. 788 N.W.2d at 48; *see also Doppler v. State*, 771 N.W.2d 867, 872-73 (Minn. 2009) (holding that other evidence, including other witnesses and a confession from the appellant, was enough to conclude that it was unlikely the jury would have reached a different result).

This case is akin to *Turnage*, *Evans*, *Vance*, and *Doppler* because there was significant evidence against Ortega in addition to Eric's account. The recantation from Eric, as described in Severo's affidavit, says that, contrary to Eric's trial testimony, Ortega and Senior did not start the fight with Troy Ulrich, that they were acting in self-defense, and that Eric felt pressured to testify that Ortega was hitting Ulrich even though Eric did not actually see most of the fight. Testifying similarly to Eric, Anthony claimed that Senior started the fight and that Ortega hit Ulrich with bolt cutters. Anthony testified that he observed the fight for 10-15 minutes, and that Eric was standing next to him. Virtually all of the relevant information in Eric's testimony was also available in Anthony's testimony. In addition to Anthony's testimony, the State offered physical evidence that connected Ortega to the murder and testimony from several witnesses who

11

described Ortega's inculpatory statements. Indeed, as the State argues, "the most compelling evidence" of Ortega's guilt came from Ortega himself. Because Eric's allegedly false testimony was cumulative to other compelling evidence of Ortega's guilt, we conclude that the outcome of the proceedings would not have been different had Eric's testimony not been admitted at trial.

Ortega argues, however, that a "different conclusion" for the purposes of *Larrison* would include a conviction of a lesser charge, as opposed to a complete acquittal. But Ortega has not demonstrated that Eric's recantation could result in a conviction of a lesser charge, such as a lower degree of murder. Removing Eric's trial testimony about the fight changes very little about the overall evidence bearing on the fight and manner of Ulrich's death. In part this is true because Eric never claimed during his trial testimony to have seen Ortega holding a knife or making stabbing motions. Even more importantly, leaving Eric's testimony aside, there were other witnesses who described the fight and events leading up to the fight, there was physical evidence connecting Ortega to the murder, and the jury heard Ortega's own admissions. Based on all of this other evidence, the absence of Eric's testimony would not have changed the jury's verdict to an acquittal or to a conviction of a lesser charge.

In sum, even if Eric's alleged recantations were found to be true following an evidentiary hearing, Ortega has not satisfied the second *Larrison* prong. Accordingly, we hold that the postconviction court did not abuse its discretion in denying Ortega's petition without an evidentiary hearing.

Affirmed.

12