HUDSON, Justice.
*15 Appellant Ronald Reed appeals from the summary denial of his second and third petitions for postconviction relief in this first-degree murder case. In his petitions, Reed alleged that two of the State's witnesses recanted, that testimony given in a related proceeding by his purported accomplice is evidence of actual innocence, that the State failed to fulfill its disclosure obligations, that he was denied his right to self-representation, and that he was denied his right to confront the witnesses against him. The postconviction court denied Reed's petitions without a hearing, concluding that five of Reed's claims were barred by the statute of limitations in Minn. Stat. § 590.01, subd. 4(a) (2018), and State v. Knaffla , 309 Minn. 246, 243 N.W.2d 737 (1976), and that Reed's evidence supporting the remaining claim (the recantation by one of the State's witnesses) failed to satisfy the test for a new trial, even when viewed in the light most favorable to Reed. Five of Reed's claims were filed after the statute of limitations expired and the sixth is legally insufficient to entitle Reed to a new trial. Because five of Reed's claims were filed after the statute of limitations expired and the sixth is legally insufficient to entitle Reed to a new trial, he is conclusively entitled to no relief. Therefore, the district court did not abuse its discretion when it summarily denied his second and third petitions for postconviction relief. We affirm.
FACTS
In 1970, Saint Paul Police Officer James Sackett was killed by a sniper while responding to a false emergency call. Although investigators were unable to identify the sniper, they identified the caller as Reed's then girlfriend, Constance Trimble (now Trimble-Smith). The State charged Trimble-Smith with aiding and abetting first-degree murder. At her 1972 trial, Trimble-Smith testified that someone had told her to call the police and told her what to say, but she refused to identify who that person was, even after she was acquitted.
In 2002, the police reopened their investigation of Officer Sackett's murder. During the investigation, police officers obtained statements from Anthony Foster, Joseph Garrett, Trimble-Smith, and John Griffin. Foster told the police that before Officer Sackett's murder, Reed had said killing a police officer could put Saint Paul "on the map." Foster also reported that after Officer Sackett's murder, he asked Reed if he had heard "about the police officer that got killed." According to Foster, Reed remained silent while another friend advised Foster to "drop it" because "we don't want to go there." Garrett told the police that a week before the murder Reed attempted to recruit him for "bringing down the first pig." Trimble-Smith told the police that Reed was the person who told her to make the phone call. Like Foster and Garrett, Griffin told the police that Reed had talked about killing a police officer shortly before Officer Sackett's murder, including Reed's statement that killing a police officer could put Saint Paul "on the map." Griffin also reported that after Officer Sackett's death, Reed told Griffin that "when [Reed] put a bead on that officer ... he felt powerful," but "when he seen the bullet hitting him, he *16 said he never felt more f**ked up in his life."
Based on the statements of Foster, Garrett, Trimble-Smith, and Griffin (as well as evidence that Reed and another man, Larry Clark, possessed a bolt-action rifle of the type used to murder Officer Sackett), the State charged Reed and Clark with aiding and abetting first-degree murder and conspiracy to commit murder. Both individuals pleaded not guilty and demanded jury trials.
Reed's trial was scheduled first. At Reed's 2006 trial, the State's evidence included:
Reed's advocacy, at meetings of the Black United Front and Inner City Youth League, of killing police officers; evidence that members of these organizations practiced shooting at silhouettes that looked like police officers; evidence that Reed and Clark possessed and transported a bolt-action rifle of the type used to murder Officer Sackett; evidence that Reed approached Joseph Garrett a week before the murder and attempted to recruit him for "bringing down the first pig"; Trimble-Smith's uncontradicted testimony that Reed prompted her to make the 911 call and travel to Clark's residence, approximately 100 yards from where Sackett was shot; and Reed's confession to John Griffin.
....
... Joseph Garrett testified that Reed advocated defending the community from the police "by whatever means necessary," which he interpreted to include killing, and that Reed invited him to "be involved in getting our first pig." Anthony Foster testified that Reed commented, "[t]hey [the police] are killing us, so we have to kill them." John Griffin and Foster both testified that Reed noted that killing a police officer could put St. Paul "on the map" and potentially get the city a Black Panther chapter. Testimony by these witnesses also established a close association between Reed and Clark, whose house was 100 yards from the scene of Officer Sackett's shooting. Foster further testified that, a few days after Officer Sackett's shooting, he asked Reed and two other friends "[d]id you hear about the police officer that got killed"? According to Foster, Reed remained silent while another friend advised Foster to "drop it" because "we don't want to go there." Donald Walker testified that Reed possessed a rifle of the type used to shoot Officer Sackett. Evidence [was offered] of Reed's arrest in 1970 with weapons and detailed plans for a hijacking plot designed to free Trimble-Smith and Clark from jail .... Finally, Griffin testified that Reed confessed to the killing.
State v. Reed (Reed I ), 737 N.W.2d 572, 582, 584-85 (Minn. 2007). The jury found Reed guilty as charged, and the district court imposed a sentence of life without the possibility of release.
On direct appeal, Reed raised four claims that are relevant here. First, he claimed that the district court committed plain error when it failed to give the jury an accomplice-corroboration instruction regarding Trimble-Smith's testimony. Id . at 582. Second, he claimed that the district court erred by refusing to dismiss the indictments against him because the prosecution failed to disclose that one grand jury witness, John Griffin, had falsely testified to the grand jury. Id . at 587. Third, he claimed that the district court erred by refusing to afford him a hearing on his motion to represent himself. Id . And fourth, he claimed that he was entitled to a new trial based on an affidavit by Trimble-Smith's daughter stating that "shortly after Reed's trial, Trimble-Smith admitted *17 that she lied during her testimony because investigators plied her with money and promises of reward." Id. at 590.
In August 2007, we affirmed Reed's conviction. We explained that, although the district court's failure to give an accomplice-corroboration instruction to the jury was plain error, Reed had failed to establish that there was a reasonable likelihood that the absence of the error would have had a significant effect on the jury's verdict. Id. at 583-85. We also concluded that the district court did not err in refusing to dismiss the indictments. Id. at 587. As for Reed's self-representation claim, we concluded that Reed had not filed a motion to represent himself but rather a motion to appoint substitute counsel, which was properly denied. Id. at 587-88. Finally, we held that the affidavit by Trimble-Smith's daughter did not entitle Reed to a new trial because it was based on hearsay and did not specify which parts of Trimble-Smith's testimony were allegedly fabricated. Id. at 590.
In February 2009, Clark pleaded guilty to conspiracy to commit murder.[1] As part of his plea, Clark said he had no "personal knowledge regarding the guilt or non-guilt of ... Ronald Reed."
Six months later, in August 2009, Reed filed his first petition for postconviction relief, which raised two claims that are relevant here. First, he argued that the district court denied his right to self-representation by not asking him how he intended to proceed if his counsel was discharged. Second, he claimed that he was entitled to a new trial because Trimble-Smith had recanted. To support his witness-recantation claim, Reed included the affidavit by Trimble-Smith's daughter that was submitted during his direct appeal, as well as three additional affidavits-one from Trimble-Smith, one from her grandson, and one from her brother. Reed did not claim that Clark's 2009 guilty plea established Reed's actual innocence. The district court concluded that Reed's self-representation claim was procedurally barred because Reed had raised it in his direct appeal and that his witness-recantation claim failed because the affidavits did not establish that Trimble-Smith's trial testimony was false. We affirmed the denial of Reed's first petition, concluding that the self-representation claim was procedurally barred and that the affidavits did not establish that Trimble-Smith's trial testimony was false. Reed v. State , 793 N.W.2d 725, 729-30, 737-38 (Minn. 2010).
On August 12, 2016, Reed filed his second petition for postconviction relief, which alleged six claims. He argued that he was entitled to a new trial based on newly discovered evidence that (1) Griffin had recanted his trial testimony, (2) Trimble-Smith had recanted her trial testimony, (3) Reed was denied his right to self-representation, (4) the State failed to disclose exculpatory evidence during discovery, (5) Reed was denied the right to confront the witnesses against him, and (6) Reed is actually innocent. In January 2017, the district court summarily denied the second petition without holding an evidentiary hearing. The court explained that it was not reasonably well-satisfied that Griffin's trial testimony was false and that the remaining five claims were barred by Minn. Stat. § 590.01, subd. 4 (2018), and Knaffla , because they had been brought more than 2 years after Reed became aware of their existence and Reed knew or should have *18 known of the claims when he brought his first petition.
Reed appealed the denial of his second petition. When briefing was partially completed, Reed asked us to stay his appeal so he could present additional evidence in the district court regarding Griffin's alleged recantation. We granted the motion, and Reed subsequently filed his third petition for postconviction relief, which dealt solely with Griffin's alleged recantation. With the petition he included affidavits wherein two individuals swore that Griffin had contacted them and admitted to lying at Reed's trial, a third affidavit wherein a private investigator swore that the owner of the number that called the first individual matched the age and race of Griffin, and various correspondence between Griffin and Reed wherein Griffin expressed remorse at being the cause of Reed's conviction. In March 2018, the postconviction court summarily denied Reed's third petition, concluding that some of the additional evidence was barred from consideration because Reed could have included it with his second petition, and that, even if all the evidence was considered, it did not alter the court's original conclusion that it was not reasonably well-satisfied that Griffin's testimony was false. When Reed appealed the summary denial of his third petition, we lifted the stay and consolidated the two appeals.
ANALYSIS
We review the denial of a petition for postconviction relief, including denial without a hearing, for an abuse of discretion. Quick v. State , 757 N.W.2d 278, 281 (Minn. 2008). A court abuses its discretion if it "exercised its discretion in an arbitrary or capricious manner, based its ruling on an erroneous view of the law, or made clearly erroneous factual findings." Henderson v. State , 906 N.W.2d 501, 505 (Minn. 2018) (citation omitted) (internal quotation marks omitted).
A court is required to grant an evidentiary hearing "[u]nless the petition and the files and records of the proceeding conclusively show that the petitioner is entitled to no relief." Minn. Stat. § 590.04, subd. 1 (2018). If material facts that would entitle a petitioner to relief are in dispute, the court must grant a hearing. Hodgson v. State , 540 N.W.2d 515, 517 (Minn. 1995). "In determining whether an evidentiary hearing is required, a postconviction court considers the facts alleged in the petition as true and construes them in the light most favorable to the petitioner." Andersen v. State , 913 N.W.2d 417, 422-23 (Minn. 2018) (quoting Brown v. State , 895 N.W.2d 612, 618 (Minn. 2017) ). "No hearing is required if a petition is untimely under the postconviction statute of limitations." Bolstad v. State , 878 N.W.2d 493, 496 (Minn. 2016).
We begin by considering whether the facts Reed alleged in support of his claim that Griffin has recanted his trial testimony, if true, were legally insufficient to grant a new trial. Next, assuming Griffin has recanted, we reconsider whether the trial court's failure to give an accomplice-corroboration instruction affected Reed's substantial rights. Finally, we consider whether Reed's remaining claims were untimely under the postconviction statute of limitations, Minn. Stat. § 590.01, subd. 4.
I.
A petitioner is entitled to a new trial based on a witness-recantation claim if:
(1) the court is reasonably well-satisfied that the testimony given by a material witness was false; (2) without the testimony, the jury might have reached a different conclusion; and (3) the party seeking the new trial was taken by surprise *19 when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial.
Brown , 895 N.W.2d at 618 (quoting Williams v. State , 692 N.W.2d 893, 896 (Minn. 2005) ). In considering whether the jury might have reached a different verdict, we do not analyze the impact of the recantation, but rather "the effect that the absence of the false testimony would have had on the result in the original trial." Dukes v. State , 621 N.W.2d 246, 258 (Minn. 2001).
If a petitioner fails to satisfy the first or second factor, the petitioner is not entitled to a new trial. Ferguson v. State , 645 N.W.2d 437, 445 (Minn. 2002). By contrast, satisfaction of the third factor is not an absolute condition precedent to granting a new trial.[2] Id. at 444-45.
In his second and third postconviction petitions, Reed claimed that he was entitled to a new trial because Griffin allegedly recanted his trial testimony that Reed confessed to "put[ting] a bead" on an officer. In support of his claim, Reed filed several affidavits. The first affidavit was by an Innocence Project attorney who swore that "[o]n December 2, 2013, John Griffin called me" and "told me he lied about everything he told the police and testified to in Reed's case." The second affidavit was by one of Reed's former attorneys, wherein the attorney swore that "[i]n March 2016[,] John Griffin contacted me by telephone, seeking legal advice about whether he could be prosecuted for perjury if he were to recant his false testimony against Mr. Reed." The third affidavit was by a private investigator from California who alleged that (1) he had contacted the owner of the phone number used to call the Innocence Project, (2) he had a meeting with the individual, and (3) the individual he met "was a large African American gentleman possibly in his sixties who appeared to have an artificial left eye." Reed also submitted various correspondence from Griffin to Reed and Reed's friends and family.
Even when the facts alleged in the affidavits and correspondence are viewed in a light most favorable to Reed, he is conclusively entitled to no relief because the alleged facts fail to establish that the jury might have reached a different conclusion without Griffin's trial testimony.[3]
*20 The State independently established Reed's guilt through the testimony of other witnesses, including Trimble-Smith, Foster, and Garrett. The jurors heard Trimble-Smith testify that Reed went with her to the phone booth where she made the false emergency call and that Reed told her what to say to the police. In addition, like Griffin, Foster testified that before Officer Sackett's death, Reed said killing a police officer could put Saint Paul "on the map." Foster also testified that after Officer Sackett's death, he asked Reed if he had heard "about the police officer that got killed." According to Foster, Reed remained silent while another friend advised Foster to "drop it" because "we don't want to go there." Although Foster's testimony did not mirror Griffin's testimony that when Reed saw the bullet hitting Officer Sackett, Reed "never felt more f**ked up in his life," it was of a similar nature. Moreover, Garrett testified that a week before the murder Reed attempted to recruit him for "bringing down the first pig." In addition to the testimony of Trimble-Smith, Foster, and Garrett, the jurors also heard that Reed and Clark possessed and transported a bolt-action rifle of the type used to murder Officer Sackett.
Based on this record, it cannot be said that the jury might have reached a different conclusion without Griffin's trial testimony, especially when the charged offenses did not require the jury to find that Reed was the shooter, but instead required the jury to find that Reed knew an accomplice was going to commit a crime and that he intended his actions to further the commission of that crime.[4] See State v. Milton , 821 N.W.2d 789, 805 (Minn. 2012) ("[T]he element of 'intentionally aiding' embodies two important and necessary principles: (1) that the defendant 'knew that his alleged accomplices were going to commit a crime,' and (2) that the defendant 'intended his presence or actions to further the commission of that crime.' "). Because the facts alleged by Reed, if true, were legally insufficient to grant the requested relief, the district court did not abuse its discretion when it summarily denied Reed's claim that he was entitled to a new trial based on Griffin's alleged recantation of his trial testimony.[5]
*21 II.
Reed asks us to revisit the plain-error analysis that we conducted in his direct appeal regarding the trial court's failure to provide the jury an accomplice-corroboration instruction. He argues that our analysis there was based in part on Griffin's trial testimony that Reed said killing a police officer could put Saint Paul "on the map" and potentially get the city a Black Panther chapter. A defendant is entitled to a new trial under plain-error review if he establishes a plain error that affects his substantial rights and that the error should be addressed to ensure fairness and integrity of the judicial proceedings. Caldwell v. State , 886 N.W.2d 491, 500 (Minn. 2016). An error affects a defendant's substantial rights if there is a reasonable likelihood that the error had a significant effect on the verdict. State v. Parker , 901 N.W.2d 917, 926 (Minn. 2017).
In Reed's direct appeal, we concluded that the district court's failure to give an accomplice-corroboration instruction was plain error, but we went on to conclude that the error did not affect Reed's substantial rights. Reed I , 737 N.W.2d at 583-85. For the reasons stated below, we conclude that even if Griffin's trial testimony is set aside, there is not a reasonable likelihood that the trial court's failure to provide the jury with an accomplice-corroboration instruction had a significant effect on the verdict.
"Corroborative evidence need not, standing alone, be sufficient to support a conviction, but it must affirm the truth of the accomplice's testimony and point to the guilt of the defendant in some substantial degree." Reed I , 737 N.W.2d at 584 (citation omitted) (internal quotation marks omitted). As we noted in Reed's direct appeal:
Trimble-Smith's testimony about Reed's involvement with the Inner City Youth League and his association with some of its other members was generally corroborated and established a motive for Reed to bring about the death of a police officer. Joseph Garrett testified that Reed advocated defending the community from the police "by whatever means necessary," which he interpreted to include killing, and that Reed invited him to "be involved in getting our first pig." Anthony Foster testified that Reed commented, "[t]hey [the police] are killing us, so we have to kill them." ... Foster ... testified that Reed noted that killing a police officer could put St. Paul "on the map" and potentially get the city a Black Panther chapter. Testimony by these witnesses also established a close association between Reed and Clark, *22 whose house was 100 yards from the scene of Officer Sackett's shooting. Foster further testified that, a few days after Officer Sackett's shooting, he asked Reed and two other friends "[d]id you hear about the police officer that got killed"? According to Foster, Reed remained silent while another friend advised Foster to "drop it" because "we don't want to go there." Donald Walker testified that Reed possessed a rifle of the type used to shoot Officer Sackett. Evidence of Reed's arrest in 1970 with weapons and detailed plans for a hijacking plot designed to free Trimble-Smith and Clark from jail also supported the inference that Reed was involved in the killing.
Id. at 584-85. This evidence supports the conclusions that Reed wanted to have an officer shooting occur in Saint Paul, that Reed was involved in Officer Sackett's murder in some capacity, and that Reed had reason to believe Trimble-Smith and Clark would be arrested shortly after the time of the shooting. Although it does not definitively confirm the phone-booth events to which Trimble-Smith testified, it does affirm the truth of Trimble-Smith's testimony and point toward Reed's guilt "in some substantial degree." Id. at 584. We therefore conclude that, even without Griffin's trial testimony, there is not a reasonable likelihood that the trial court's failure to give an accomplice-corroboration instruction had a significant effect on the verdict.
III.
A petition for postconviction relief must be brought within 2 years of the later of: "(1) the entry of judgment of conviction or sentence if no direct appeal is filed; or (2) an appellate court's disposition of [the] petitioner's direct appeal." Minn. Stat. § 590.01, subd. 4(a). However, a petition filed after the 2-year period in subdivision 4(a) has expired may still be timely under one of the five exceptions in subdivision 4(b) of the statute. A petition invoking an exception "must be filed within two years of the date the claim arises." Id. , subd. 4(c). A claim arises on the date that the petitioner knew or should have known of the claim giving rise to the exception. Henderson , 906 N.W.2d at 506.
In the district court, Reed invoked the newly-discovered-evidence exception, Minn. Stat. § 590.01, subd. 4(b)(2), to pursue his remaining claims that: (1) Trimble-Smith had recanted her trial testimony, (2) he was denied his right to self-representation, (3) the State failed to disclose exculpatory evidence during discovery, (4) he was denied the right to confront the witnesses against him, and (5) he is actually innocent. The newly-discovered-evidence exception allows a court to hear an otherwise untimely petition when:
the petitioner alleges the existence of newly discovered evidence , including scientific evidence, that could not have been ascertained by the exercise of due diligence by the petitioner or petitioner's attorney within the two-year time period for filing a postconviction petition, and the evidence is not cumulative to evidence presented at trial, is not for impeachment purposes, and establishes by a clear and convincing standard that the petitioner is innocent of the offense or offenses for which the petitioner was convicted [.]
Minn. Stat. § 590.01, subd. 4(b)(2) (emphasis added).
Even when the facts alleged in Reed's second and third postconviction petitions are viewed in the light most favorable to Reed, he is conclusively entitled to no relief because the alleged facts fail to satisfy the newly-discovered-evidence exception. When he filed his direct appeal *23 more than 10 years ago, Reed claimed that Trimble-Smith had recanted. Indeed, one of the headings in his pro se brief there was "The State's lone witness has now recanted her testimony and the Court should order a new trial." Although Reed now claims to have "new" evidence of that recantation, the evidence simply amounts to a restatement of an argument he made at trial to the jury: that because of the contradiction between Trimble-Smith's 1972 testimony (when she claimed that Reed was not the one who instructed her to make the call) and her 2006 testimony (when she claimed that Reed was the one who instructed her to make the call), her description of Reed's involvement should not be believed. The jury weighed this argument and concluded that Trimble-Smith was telling the truth in 2006, not 1972. Moreover, the fact that during Clark's case the State stipulated that Trimble-Smith's 1972 testimony was that Reed did not instruct her to make the call does not change the fact that Reed (or Reed's attorney) knew or should have known of her 1972 testimony more than 2 years before Reed filed his second petition for postconviction relief.[6] Minn. Stat. § 590.01, subd. 4(b)(2) ; Henderson , 906 N.W.2d at 506.
The same can be said about Reed's self-representation claim. Even when the allegation that Reed did not know of the contents of the motion his brother drafted is viewed in a light most favorable to Reed, he is conclusively entitled to no relief because the attorney who represented Reed in his first postconviction proceeding clearly had such knowledge. Reed's first postconviction petition explicitly discusses the contents of the motion and how it failed to include "Reed's intention to proceed pro se as an alternative fall-back position to his primary request for different counsel."
Reed argues he is entitled to a new trial because the State violated its disclosure obligations by not disclosing that (1) at Trimble-Smith's 1972 trial she testified that Reed did not tell her to make the call and that he was home sleeping, (2) Trimble-Smith was promised a $ 100,000 reward if her testimony helped convict Reed, and (3) during Trimble-Smith's initial meeting with investigators, she reaffirmed her 1972 trial testimony. Claims based on these alleged disclosure-obligation violations are time-barred. Reed filed an affidavit by Trimble-Smith with his 2009 postconviction petition. In that affidavit, Trimble-Smith stated that (1) during her trial she testified that Reed did not tell her to make the phone call and that he was home sleeping, (2) she was promised a $ 100,000 reward after Reed's trial was over, and (3) when investigators interviewed her, she told them what she testified to at her 1972 trial. Thus, in 2009 Reed was aware of these three pieces of evidence and that the State (according to him) failed to disclose them. More than 2 years have elapsed since Reed made this discovery, and therefore claims based on it are time-barred.
Reed's fourth claim is that he was denied his right to confront Griffin because the district court limited the scope of cross-examination. Reed does not provide any explanation as to why, despite knowing *24 of this limitation for more than 10 years, a postconviction petition brought on this basis can avoid the statutory time bar. Accordingly, we conclude that this claim is barred by Minn. Stat. § 590.01, subd. 4(a).
Finally, Reed argues he is entitled to a new trial because of a statement made by Clark on February 19, 2009, when Clark pleaded guilty to conspiracy to commit murder. As part of his plea, he stated that he had no "personal knowledge regarding the guilt or non-guilt of ... Ronald Reed." But as with Reed's other claims, this claim is time-barred. Even when the evidence is viewed in the light most favorable to Reed, accepting that he was personally unaware of the statement until 2015, Clark made the statement 6 months before Reed filed his first postconviction petition. "[D]ue diligence by ... [Reed's] attorney" could have ascertained Clark's statements before Reed filed his first petition, and certainly within 2 years of when the statements were made. See Minn. Stat. § 590.01, subd. 4(b)(2).
Attempting to avoid the 2-year statute of limitations, Reed seeks to invoke the interests-of-justice exception, Minn. § 590.01, subd. 4(b)(5). The interests-of-justice exception allows a court to hear an otherwise untimely petition when "the petitioner establishes to the satisfaction of the court that the petition is not frivolous and is in the interests of justice." Id. To invoke this exception, "the claim must relate to an injustice that delayed the filing of the petition, not to the substantive merit of the petition." Andersen , 913 N.W.2d at 428 (internal quotation marks omitted). For example, in Rickert v. State , we held that the petitioner's otherwise untimely petition satisfied the interests-of-justice exception where the untimeliness was caused by a third party's dilatory conduct. 795 N.W.2d 236, 242 (Minn. 2011).
Viewing the facts alleged in the light most favorable to Reed, we conclude that they fail to establish an injustice that delayed the filing of his second and third postconviction petitions. More specifically, Reed has not alleged any facts that suggest that the untimeliness was caused by a third party's dilatory conduct.
In sum, even when the facts alleged in Reed's second and third postconviction petitions are viewed in a light most favorable to Reed, he is conclusively entitled to no relief because the alleged facts fail to satisfy an exception to the 2-year statute of limitations. Therefore, the district court did not abuse its discretion when it summarily denied the petitions without holding an evidentiary hearing.
CONCLUSION
For the foregoing reasons, we conclude that the district court did not abuse its discretion when it denied Reed's second and third postconviction petitions without holding an evidentiary hearing.
Affirmed.
Concurring in part, dissenting in part, Thissen, J.
THISSEN, Justice (concurring in part, dissenting in part).
CONCURRENCE & DISSENT
I agree that appellant Ronald Reed's claims that are based on the newly-discovered-evidence exception, see Minn. Stat. § 590.01, subd. 4(b)(2) (2018), fail because they are untimely and thus Reed is conclusively entitled to no relief.
I dissent from the court's opinion, however, because the postconviction court should have granted Reed an evidentiary hearing before denying his request for a new trial based on the recantation of trial testimony by critical witness John Griffin.
*25 Our standard for granting an evidentiary hearing is not demanding. The court must view the facts supporting a petition for postconviction relief in the light most favorable to Reed and determine whether those facts entitle Reed to relief. If there is any doubt about whether Reed is entitled to relief, the postconviction court must grant an evidentiary hearing. Reed has satisfied that standard.
I.
During Reed's 2006 trial for the tragic 1970 murder of Saint Paul Police Officer James Sackett, the State called Griffin as a witness. Griffin testified that Reed told him a decade after the murder that "when [Reed] put a bead on that officer, on that cop, he said he felt powerful, he felt strong. He said, but when he seen the bullet hitting him, he said he never felt more [expletive deleted] up in his life." And when asked by the prosecutor if Reed admitted that he was the shooter, Griffin testified: "Yes, he did. Well, that's what he said, what I just mentioned." Griffin offered the only testimony in the record of a confession by Reed.
At the time of the 2006 trial, Griffin was serving a 30-year drug sentence in a federal penitentiary. His sentence was supposed to run through 2019. He testified at trial that he reached out to the police in 2003 and told investigators that he could "solve the Sackett case" if they would release him from prison. He also admitted at trial that, in addition to paying for new $ 600 glasses, the state agreed to let the federal sentencing judge know about his cooperation, a fact that the judge could rely upon to reduce his federal prison sentence. Griffin was released from prison twelve years early in 2007, shortly after Reed's trial.
In support of his postconviction petition, Reed provided the postconviction court with evidence that Griffin lied when he testified that Reed confessed to shooting Officer Sackett. Reed provided the sworn affidavit of Julie Jonas, an attorney and Legal Director of the Minnesota Innocence Project. Jonas stated under oath that John Griffin called her at her office on December 2, 2013, and told her that "he lied about everything he told the police and testified to in Reed's case. He did this because he hoped it would get him out of prison." In her affidavit, Jonas states that Griffin told her that "police visited him in prison, and they made him aware that if he would testify against Reed they would help him with his sentence. ... He felt this was the only hope he had to get out of prison." Jonas stated that Griffin believes that Kelly Day was the murderer and that Griffin "heard Day make references to the murder that made him believe that Day was the actual perpetrator." Jonas also recorded the caller's telephone number and email address in a contemporaneous memorandum included in the court record.
Reed also offered as evidence a sworn affidavit from Howard Bass, a lawyer who previously represented Reed on a postconviction petition. Bass stated that Griffin contacted him to ask about the statute of limitations on perjury. In the conversation "Griffin indicated both a desire to recant his false testimony at Mr. Reed's trial and a reluctance to do so after learning that he could be prosecuted for perjury."
Reed also provided the court with several letters and an email from "John" or "John Griffin." In the communications, Griffin confessed remorse for falsely testifying at Reed's trial and offered to "tell the truth" while admitting he was concerned about the consequences of admitting perjury. He explained that he was a practicing Buddhist and that he could not "allow a lie to escape my lips or my Karma will be bad." He said that he was motivated to put things right before he died.
*26 Finally, Reed offered a sworn affidavit of a California investigator who contacted the telephone number Griffin provided to Julie Jonas and set up a meeting. The person the investigator met was a large African American man with an artificial eye[1] who identified himself as John Griffin.
II.
In his postconviction petition, Reed seeks a new trial based on Griffin's recantation. He also seeks an evidentiary hearing before the postconviction court. We review a postconviction court's refusal to grant an evidentiary hearing for abuse of discretion. Campbell v. State , 916 N.W.2d 502, 506 (Minn. 2018).
The test for whether a defendant is entitled to an evidentiary hearing on a witness recantation claim is well-settled:
To determine whether petitioner is entitled to an evidentiary hearing, the postconviction court must determine whether the competent evidence presented by petitioner considered in the light most favorable to the petition, together with the arguments presented by the parties, conclusively show that the petitioner is not entitled to relief. If so, the court may deny the request for an evidentiary hearing. If the court concludes that material facts are in dispute and that the allegations in the petition, if true, would entitle the petitioner to relief, then the court must schedule an evidentiary hearing.
Martin v. State , 825 N.W.2d 734, 740 (Minn. 2013) (emphasis added) (citations omitted); see Minn. Stat. § 590.04, subd. 1 (2018).
The burden rests with the petitioner to "allege facts that, if proven, would entitle him to the requested relief." Wilson v. State , 726 N.W.2d 103, 107 (Minn. 2007) (internal quotation marks omitted) (citation omitted). But "[a] petitioner's burden of proof for a postconviction evidentiary hearing is lower than his burden for a new trial." Id. Further, while the allegations must be more than conclusory and supported with facts, we have held that evidence presented in a "sworn statement[ ]" surmounts the "argumentative assertions" bar. Opsahl v. State , 677 N.W.2d 414, 424 (Minn. 2004). Finally and critically, "[i]f the postconviction court harbors any doubts as to whether to conduct an evidentiary hearing, it should resolve those in favor of granting the hearing." Id. at 423.
"[W]e have noted that evidentiary hearings are particularly appropriate when the petition attacks important evidence in a circumstantial case." Id. We have also said that we are "reluctant to deny a hearing for postconviction relief when our decision turns on the credibility of recanting witnesses." Id. ; see also Wilson , 726 N.W.2d at 107. In fact, we have repeatedly "reiterate[d] ... the necessity of an evidentiary hearing to resolve credibility issues." State v. Turnage , 729 N.W.2d 593, 598 (Minn. 2007).
The assessment of whether to grant an evidentiary hearing in recantation cases is guided by the Larrison test we adopted nearly forty years ago in State v. Caldwell , 322 N.W.2d 574, 584-85 (Minn. 1982) (citing Larrison v. United States , 24 F.2d 82, 87-88 (7th Cir. 1928) ). The rule states that a new trial may be granted on the basis of false or perjured testimony where (a) the court is reasonably well satisfied that the testimony given by a material *27 witness is false; (b) the jury might have reached a different conclusion without the testimony; and (c) the party seeking a new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial. Id. In the context of a request for a postconviction evidentiary hearing, the petitioner is required to show that, when the evidence is viewed most favorably to the petitioner, material questions of fact exist to support the three prongs of the Larrison test. Ferguson v. State , 645 N.W.2d 437, 446 (Minn. 2002). We have stated that a request for an evidentiary hearing on a recantation claim requires a "significantly lesser showing" than a new trial request. Id. "To obtain a postconviction evidentiary hearing, [a petitioner is] not required to satisfy the Larrison test. Instead, he [is] simply required to present competent material evidence that, if found to be true following an evidentiary hearing, could satisfy the Larrison test." Martin , 825 N.W.2d at 743.
III.
I turn now to each Larrison factor.
A.
The evidence of Griffin's recantation is material proof that Griffin's trial testimony was false and, therefore, sufficient to require an evidentiary hearing on whether he is entitled to relief. Griffin stated that his trial testimony that Reed shot Officer Sackett was a lie. He identified another person as the shooter. The recantation evidence is more than a conclusory assertion of false testimony.
Griffin's recantation also carries strong indicia of trustworthiness and genuineness. Griffin's trial testimony that Reed confessed in the early 1980s is not corroborated by other testimony. Indeed, Reed was in prison himself in the early 1980s, which seriously calls into question Griffin's trial testimony. Further, the recantation evidence "gives a reason for his change in testimony." Ferguson v. State , 779 N.W.2d 555, 560 (Minn. 2010). The postconviction evidence (as well as Griffin's testimony at the 2006 trial) shows that Griffin had a strong motive to lie at trial: the State offered to help him get out of prison over a decade early if he cooperated. The evidence also shows that Griffin (now an avowed Buddhist) wanted to tell the truth before he died and not allow a lie to affect his Karma. See Martin , 825 N.W.2d at 742-43 (finding genuineness when recanting witness explained that after spending a great amount of time in prison he wished to "make a wrong right"). And, in any event, we have held that "[a]n evidentiary hearing is often necessary to determine whether a recantation is genuine." Ferguson , 779 N.W.2d at 560.
The postconviction court concluded Griffin did not satisfy the first prong of the Larrison test because it could not verify that Griffin was the person who called Jonas or Bass or who wrote the communications. The postconviction court also reasoned that Reed did not "describe any admissible evidence of Mr. Griffin's alleged recantation."
I conclude that the postconviction court abused its discretion. The postconviction court's decision to disregard the significant evidence that Griffin lied at trial because it could not verify that Griffin called Jonas and Bass and wrote the numerous letters and emails ignores important evidence. Most importantly, Reed provided an affidavit from a licensed private investigator who in 2017 used the telephone number of the person who contacted Jonas to track down and meet with a large African-American man who had an artificial eye and who identified himself as John Griffin. Similarly, a 2016 e-mail communication from John *28 Griffin confirming the details of the conversation between Griffin and Bass described in the Bass Affidavit was sent from the same e-mail address that Griffin provided to Jonas over two years earlier. Moreover, the calls to Jonas and Bass-in addition to the letters and emails-provide significant specific detail that only Griffin would know.[2] Particularly in light of our directive that the postconviction court view evidence in the light most favorable to the petitioner, the evidence presented in support of Reed's petition provides more than enough "verification" to require an evidentiary hearing.
The postconviction court also abused its discretion when it concluded that the evidence of Griffin's recantation was insufficient to require a postconviction hearing because the evidence is not "admissible." We have stated that "submitting an affidavit containing hearsay does not preclude a postconviction court from granting an evidentiary hearing." Dobbins v. State , 788 N.W.2d 719, 736 (Minn. 2010). That conclusion is particularly strong where the hearsay statements are admissible under an exception to the hearsay rule as statements against penal interest. Ferguson , 645 N.W.2d at 443. Because Griffin's recantation puts him in jeopardy of perjury, the statements against penal interest exception may apply to allow admission of the Jonas and Bass testimony if Griffin refuses to testify or is otherwise unavailable. Id.
B.
I next consider the second prong of the Larrison test: whether the jury might have reached a different conclusion in Reed's trial without Griffin's testimony. When we make this inquiry in the context of a request for an evidentiary hearing, we assume that the recanted trial testimony is false and was not presented to the jury. Turnage , 729 N.W.2d at 599. We do not apply a typical sufficiency-of-the-evidence test, which asks if the evidence that remains after the false testimony is eliminated would be enough for a reasonable jury to convict the defendant. Id. (rejecting sufficiency-of-the-evidence test).
Instead, because the false testimony might have been so powerful that it affected how the jury viewed the remaining evidence, we ask "whether the jury might have found the defendant not guilty if the recanting witness had not testified." Id . at 599 ; see also Caldwell , 322 N.W.2d at 585-86. Stated another way, we consider how the testimony of the recanting witness may have affected how the jury viewed the remaining evidence. The question of whether the jury "might" have reached a different conclusion is an undemanding requirement. " '[M]ight' is 'something more than an outside chance although much less than [ ] would probably.' " Martin , 825 N.W.2d at 743 (quoting Caldwell , 322 N.W.2d at 585 n.8 ). We have said that the test is satisfied where the other evidence against the defendant is not overwhelming. Id. at 743.
Because the postconviction court concluded that Reed's request for an evidentiary hearing failed on the first Larrison prong, it did not assess whether the outcome at trial would have been different in the absence of Griffin's testimony. The majority, however, concludes that the evidence that Reed presented to the postconviction court "fail[s] to establish that the jury might have reached a different conclusion *29 without Griffin's trial testimony." But in reaching that conclusion, the majority focuses on whether the State "independently established Reed's guilt through the testimony of other witnesses," effectively applying a sufficiency-of-the-evidence test rather than the "might have reached a different conclusion" test required under our precedent.
In fact, aside from Griffin's testimony that Reed confessed to shooting Officer Sackett, the trial evidence was entirely circumstantial. Joseph Garrett testified that Reed generally advocated for defending his community from the police "by whatever means necessary" and that Reed invited him to "be involved in getting our first pig." Anthony Foster testified that Reed said killing a police officer would get St. Paul "on the map" for a Black Panther chapter. Foster also testified that Reed remained silent when asked about the shooting of Officer Sackett a few days after the murder. None of these statements are criminal in themselves and none directly connect Reed to Sackett's murder. The State adduced evidence that at one point a year before the shooting , Reed possessed a rifle of the type used to kill Officer Sackett. There was no testimony that rifle was used in the shooting. Reed's alleged (and convicted) co-conspirator, Clark, refused to connect him to the crime. And Constance Trimble-Smith testified that Reed told her to make-and scripted-the false emergency call to the police that resulted in Officer Sackett arriving on the scene where he was killed. But not one of these witnesses directly connected Reed to the murder of Officer Sackett.
Trimble-Smith's testimony merits further examination. While she did testify that Reed asked her to make the fake emergency call, she also testified that both she and Reed understood the purpose of the call was to set up Gerald Starling, who had allegedly been stealing from a community organization and who had previously brandished a gun at Trimble-Smith's mother and brother. According to Trimble-Smith, the police were called to a house where Starling was holding a party with drugs. She also testified that after the call, she and Reed went to Larry Clark's house for five to seven minutes, that Reed never left Clark's house, and that she and Reed went directly home after leaving Clark's house. She further testified that "[Reed] was just an innocent agent" and that "[h]e didn't kill anybody." In other words, Trimble-Smith's testimony undermined and weakened the State's case in many ways.
The majority justifies its conclusion that "it cannot be said that the jury might have reached a different conclusion without Griffin's trial testimony" because Reed was convicted of "aiding and abetting" rather than pulling the trigger. To support this conclusion, the majority relies most heavily on Trimble-Smith's testimony that Reed arranged for her to make the police call that drew Officer Sackett to the scene of the murder. The majority appropriately concedes that Reed's intention in making the call is essential to its case, but then surprisingly asserts that "no jury could have concluded that Reed had any intention other than luring the police into an ambush." In fact, as discussed above, Trimble-Smith herself provided an alternative explanation for the phone call. This confusion in the evidence provided by the State is why the direct testimony of Griffin was so compelling and why its recantation may be so powerful, especially considering the very low hurdle the "might have reached a different conclusion" test poses for a person seeking a postconviction evidentiary hearing.
We have repeatedly held that where the recanted testimony is direct evidence of the crime and the other evidence at trial is *30 mostly circumstantial, the second prong of the Larrison test is satisfied. Martin , 825 N.W.2d at 744 (explaining that the recanting witnesses were the only witnesses who offered direct evidence at trial that the defendant committed the crime); Dobbins , 788 N.W.2d at 735 (noting that the recanting witness was the only eyewitness to offer direct evidence that the defendant shot the victim); Ferguson , 779 N.W.2d at 561 (holding that the second Larrison prong is satisfied where the witness who recanted was the only eyewitness to the shooting who testified at trial and he testified that the defendant was involved in the shooting); Opsahl , 677 N.W.2d at 424 (noting that the recantations of five out of seven witnesses were particularly significant because there was no physical evidence linking the defendant to the murder).
The circumstantial evidence against Reed simply is not overwhelming. No witness other than Griffin directly connects Reed to the shooting. In that context, Griffin's testimony that Reed confessed to the killing was incredibly powerful. And if we remove Griffin's testimony from the trial, there is unquestionably "something more than an outside chance" that the jury would have reached a different conclusion.
C.
Finally, I turn to the third prong of the Larrison test, which asks whether the party seeking a new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial. We have held that the third factor, "while relevant, is not an absolute condition precedent to relief." Ortega , 856 N.W.2d at 103. In particular, when the remaining evidence after exclusion of the recanted testimony is largely circumstantial, we have required a postconviction evidentiary hearing even in circumstances where the defendant knew the recanting witness was lying at trial. Ferguson , 645 N.W.2d at 445. On this point, I agree with the postconviction court, which correctly decided that the third Larrison prong should not preclude an evidentiary hearing on Reed's claims.
IV.
I understand that postconviction evidentiary hearings consume valuable judicial resources. I also understand the impact an evidentiary hearing may have on the victim's family and his employer. On the other hand, we talk often and properly about how our criminal justice system must constantly strive toward transparency and accountability to everyone to nurture trust that the decisions we reach are fair. Denying Reed an evidentiary hearing on this record undermines that goal. I would reverse the decision of the postconviction court and remand this case for an evidentiary hearing on Reed's demand for a new trial based on Griffin's recantation of his trial testimony.

In April 2006, a jury found Clark guilty of aiding and abetting first-degree murder and conspiracy to commit murder. Based on a trial error, we reversed Clark's convictions and remanded for a new trial. State v. Clark , 755 N.W.2d 241, 251-58 (Minn. 2008). On remand, Clark pleaded guilty to the conspiracy charge.

In Ferguson , we explained why the absence of surprise alone does not bar acceptance of an otherwise truthful-seeming recantation. 645 N.W.2d at 444-45. More specifically, we adopted the reasoning of the Seventh Circuit in United States v. Leibowitz :
Surprise is relevant, surely. If the defendant had every opportunity to meet the allegedly false testimony at trial, his failure to unmask its falsity at that time is some evidence that the testimony was true. But why the defendant should be required to demonstrate surprise in every case of recantation baffles us. In a case such as this in which the principal (though not the only) evidence of guilt is the testimony of an accomplice or eyewitness, the only resource of the defendant in unmasking the falsity, even with all the advance warning in the world, may be cross-examination, which-much mythology to the contrary notwithstanding-is not an infallible lie detector.
919 F.2d 482, 484 (7th Cir. 1990).

Because we conclude that under the second factor of the witness-recantation test, Reed is conclusively entitled to no relief, Reed's argument that the district court improperly assessed the credibility of the affiants in its analysis of the first factor is immaterial to our conclusion that Reed is conclusively entitled to no relief. Although we do not reach the issue, the dissent makes a compelling argument that the district court, to the extent the court weighed the credibility of evidence regarding Griffin's recantation, abused its discretion. By contrast, to the extent that the district court denied an evidentiary hearing because the court concluded that the hearsay affidavits did not carry sufficient "indicia of trustworthiness to warrant a hearing," that analysis is not inconsistent with our precedent. See Martin v. State , 825 N.W.2d 734, 740-41 (Minn. 2013) (internal quotation marks omitted) (concluding that where a recantation claim was based on an affidavit that was "objectively not true" because the affidavit's explanation of the recantation was chronologically impossible, the recantation lacked sufficient indicia of reliability and no hearing was required). But, even assuming the dissent is correct, because Reed failed the second prong of the Larrison test, "it is not necessary to address the other Larrison criteria." Martin v. State , 865 N.W.2d 282, 291 (Minn. 2015). Nevertheless, we remind district courts that when considering petitions for postconviction relief, they must not make credibility determinations without first holding an evidentiary hearing. Andersen , 913 N.W.2d at 423 ("We have repeatedly instructed postconviction courts that they may not find a postconviction affiant unreliable without first holding an evidentiary hearing to assess the affiant's credibility.").

Our conclusion that Reed failed to establish that the jury might have reached a different conclusion without Griffin's trial testimony is reinforced by the fact that the district court instructed the jury that "[t]he State is not required to prove who actually fired the shot that killed James Sackett," and the State repeatedly argued to the jury it could do so.

In considering whether the jury might have reached a different conclusion without Griffin's testimony, it is important to bear in mind that Reed was not convicted of murder, he was convicted of aiding and abetting murder. The dissent claims that "aside from Griffin's testimony," the trial evidence was entirely circumstantial. But this is not the case. Although (putting aside Griffin's testimony) there was only circumstantial evidence that Reed pulled the trigger, there was direct evidence that Reed drove Trimble-Smith to the phone booth and told her what to say. The only element in question for which there is not direct evidence was Reed's intent while doing so. But, unless a defendant testifies and admits to having a particular intent, intent must be proven by circumstantial evidence. See State v. Cooper , 561 N.W.2d 175, 179 (Minn. 1997) ("Because intent and premeditation are states of mind, they are generally proved circumstantially-by drawing inferences from the defendant's words and actions in light of the totality of the circumstances."). Here, considering the totality of the circumstances, no jury could have concluded that Reed had any intention other than luring the police into an ambush. We also disagree with the dissent's contention that we are misapplying the second prong of the Larrison test. We do not examine whether the evidence, without Griffin's testimony, was sufficient as the dissent contends. Instead, we examine whether there is "significant additional evidence of a defendant's guilt ... presented at trial, besides the recanted testimony." Ortega v. State , 856 N.W.2d 98, 104 (Minn. 2014). When that is the case, "we have concluded that the second Larrison prong is not satisfied." Id . We reach the same conclusion here as we did in Ortega .

Despite Reed's assertion to the contrary, Trimble-Smith has never admitted to perjury in any of her affidavits. Although she says that "[d]uring the course of my [1972] trial ... I testified that ... Reed was not the party who asked me to make the telephone call," and that investigators told her "it would be ok for [her] to change [her] testimony from what [she] testified at [her] trial," Trimble-Smith never alleges that the 1972 testimony was true and the 2006 testimony was false.

At the 2006 trial, Griffin testified that he lost his eye as a result of an attack while in prison.

We have never held that a postconviction court can deny an evidentiary hearing solely on the ground that the recanting witness did not submit his own affidavit. When the evidence presented by the petitioner has hallmarks of trustworthiness, that evidence should be tested in a hearing.